# Mary Howe, Administratrix, Appellee, v. Chicago City Railway Company, Appellant.

## Gen. No. 16,465.

1. INSTRUCTIONS—*when should be accurate.* Where the evidence is closely conflicting the instructions should be accurate.

2. INSTRUCTIONS—*assumption of facts.* An instruction is improper which assumes the existence of facts in dispute.

3. INSTRUCTIONS—*how facts to be determined.* Instructions should require that the essential facts be established by the evidence.

4. INSTRUCTIONS—*when as to duty of master to furnish safe place erroneous.* An instruction is erroneous which in effect unqualifiedly announces it to be the duty of the master to keep reasonably safe the premises or place where the servant was injured regardless of the question whether it was necessary or proper for such servant in the performance of his duties to go there.

Action in case. Appeal from the Superior Court of Cook county; the HON. BEN M. SMITH, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1910. Reversed and remanded. Opinion filed May 9, 1912.

B. F. NICHOLSON and C. LE ROY BROWN, for appellant.

EDWARD R. LITZINGER, for appellee.

MR. PRESIDING JUSTICE GRIDLEY delivered the opinion of the court.

This is an action brought in the Superior Court of Cook county by Mary Howe, administratrix of the

estate of Matthew Howe, deceased, appellee, against Chicago City Railway Company, appellant and hereinafter referred to as defendant, to recover damages for personal injuries sustained by said Matthew Howe resulting in his death. The jury found the defendant guilty and assessed plaintiff's damages at $8,000. The judgment followed and defendant appealed to this court.

The facts are substantially as follows: Defendant operated a power house at the northeast corner of 49th Street and Oakley avenue, in the city of Chicago. It was a building of considerable area and of one story and a basement. The main floor contained two large rooms. One, the boiler room, was on the north side of the building, and the other, the engine room, was on the south side. In the boiler room were two long batteries of boilers extending east and west, and between the two batteries was an open space about 30 feet wide and about 150 feet in length east and west. The basement corresponded in general outlines, as to the aisles and walls, with the main floor. The plant was equipped with an automatic stoker system which fed the boilers with coal from the bunkers. Two coal conveyors ran on endless belts through the basement under the boilers, then upwards from the bunkers above the boilers and then down to the point of beginning. These conveyors ran east and west through the basement, and one was located along the north line of the south battery of boilers. The conveyors were used both for bringing in coal and for removing ashes. The ashes were taken from the ashpits in the basement of the boiler room into the conveyors and by them dumped into cinder cars outside the building. Near the center of said open space between the two batteries of boilers was an iron stairway leading from the main floor into the basement. This stairway was in frequent use. The boilers of the south battery were separated at about the center by an open alleyway about eight feet wide and

thirty feet long. This alleyway extended from said open space south to the south wall of the boiler room. In the basement, the north end of this alleyway was partially obstructed by one of said coal conveyors, the top of which was about twenty-six inches from the floor of the basement and the bottom about eight inches from said floor, and the south end of this alleyway led into another smaller alleyway about five feet wide and extending to the east and to the west. The portion of said smaller alleyway which ran west from said main alleyway was obstructed by a large exhaust pipe, and the portion which ran east extended to the east end of the east ashpit of said south battery of boilers, where there was another exhaust pipe. To the north of said smaller alleyway was the wall of said east ashpit, and to the south was the wall that separated the boiler room from the engine room. About the center of said smaller alleyway was an opening through said last mentioned wall, and on the floor of said smaller alleyway, about half way between said opening in said wall and said large alleyway, was a catch basin, containing hot water and steam, which was covered by an iron cover laid on brick and level with said floor. This smaller alleyway was dark, generally not lighted and no lights were burning therein at the time of the accident. The evidence tends to show that Matthew Howe was about forty-five years old and had been employed by the defendant for twenty years and in said power house for seven years; that prior to the accident, he was a strong and healthy man, an intelligent workman and in full possession of all his faculties; that he had charge of a gang of men attending to the coal unloading machine and the coal conveyors, and also had charge of the removal of the ashes, spent about two hours a day in the basement at that work and was required to be in the basement at least twice every day; that he had little occasion to go into said smaller alleyway; that Howe was subject to the call of the engineer

in charge of the plant, Michael J. Callahan, to bring in his men to assist said engineer in doing any work required; that Howe "did general work around," and had a general supervision of everything in the basement; that about three o'clock on the afternoon of September 6, 1906, there was trouble in getting coal into the magazines of the boilers from the bunkers, and Callahan called Howe to bring in his men to assist him in the work; that at that time Howe was working at the coal unloading machine on the north side of the building, outside; that after Howe had placed his men around in different positions, Callahan asked Howe to go and call Usbick, one of Howe's gang called "Billy," who was then at work in the basement of the engine room, south of the wall separating said room from the boiler room and a little east of the said opening in said wall; that at the time Callahan asked Howe to call "Billy" there was no catastrophe pending, no occasion for Howe to use haste, and that Callahan gave Howe no order or direction as to the route Howe should take; that at the time Callahan asked Howe to call "Billy" they were standing about in the center of the main floor of the boiler room; that Howe could have walked on the main floor of said boiler room around the east end of said south battery of boilers to a wooden stairway where, upon descending said stairway, he would have been but a few feet east of where "Billy" was then working, and that this would have been a safe, open and unobstructed route, though a longer one than the one Howe seemingly took. Although no one noticed what route he took, the testimony seems to indicate that he went down the iron stairway leading from the boiler room into the center of said large open space in the basement, that after descending said stairway he walked in a southerly direction, stepped over said coal conveyor, which was not running, passed along said alleyway between said south battery of boilers until he reached said smaller alleyway, when he turned east

passing over said catch basin, passed along said smaller alleyway until he came to a point where, because of the said opening in the said wall between the engine room and boiler room, his voice could be heard by "Billy," and there called "Billy." Usbick testified, "I heard Howe call but I didn't see him, * * * I heard Howe hollering; he says 'Billy, Mike Callahan wants you.'" Usbick further testified, "The wooden stairway from the first floor to the basement wasn't far from where I was. * * * When Howe hollered I quit work and walked over to the steps and went up to Mr. Callahan in the engine room." The testimony also seems to indicate, although no one saw what happened, that Howe after calling "Billy" retraced his steps along said smaller alleyway, and upon reaching said catch basin the lower portion of his body got into the same, and by reason of the hot water and steam therein he was severely burned and scalded; that he was next seen moving to the north in said alleyway and going up said iron stairs; that then Callahan and other employes of the plant noticed that his clothing was wet and hot, and, upon removing his clothing on the lower part of his body, saw that both legs were badly burned and scalded. Callahan testified that he asked Howe what was the matter, and that Howe replied that he had stepped into "the catch basin." An ambulance was called and Howe was taken to the St. Bernard's Hospital and treated, where after lingering ten days, he died.

It is claimed by counsel for defendant that the testimony tends to show that, in addition to the safe and unobstructed route above mentioned which Howe might have taken, there was another safe and unobstructed route which he might have taken, viz:—He might have descended said iron stairway, gone east in said large open space in said basement, then, turning to the south, might have passed east of said coal conveyor and said ashpit, and then, passing through a door in

the basement of said wall between the engine room and boiler room, been within a few feet of where "Billy" was working. But the testimony is conflicting as to whether or not this was an unobstructed route. There is also a sharp conflict in the testimony as to whether said smaller alleyway was used generally by Howe and his men as a passageway, or whether it was only used occasionally by other employes in cleaning said catch basin, and in making such repairs to the plant as required their presence temporarily in said smaller alleyway.

In urging this court to reverse the judgment, counsel for the defendant contends, substantially, (1) that defendant is not liable for the injury (a) because Howe, in obeying the order to go and call "Billy," took a darker and more unsafe route than he could have taken, (b) because defendant owed no duty to him to have the place where he went safe, (c) because the narrow alleyway where the accident presumably occurred was not a passageway for general use by Howe and other employes of defendant, (d) because no actionable negligence on the part of defendant was proved, (e) because there is no proof that Howe exercised due care, and (f) because Howe assumed the risk; (2) that it is not shown by a preponderance of the evidence that Howe died as a result of the burns and injuries; (3) that the first, third and fourth counts of the original declaration did not allege that Howe died as a result of the injuries, and the amendments to said counts attempting to remedy this defect introduced a new cause of action, and said amendments being made more than one year after Howe's death, the court erred in sustaining a demurrer to defendant's plea of the statute of limitations to said counts as amended; and (4) there was manifest error in the court giving to the jury the second instruction offered by plaintiff.

We do not think there is any merit in counsel's points numbered 2 and 3, but that there is merit in their con-

tention as to said second instruction. After a careful consideration of the entire record we have reached the conclusion that the trial court committed error, prejudicial to defendant, in giving said instruction, and that the judgment must be reversed, and the cause remanded for a re-trial. Such being our conclusion it is manifest that a discussion here of counsel's contentions, numbered 1 above, would be improper. We may, however, say with propriety that in our opinion the evidence on certain facts essential to establish the liability of defendant, is quite conflicting, and in such case it is important that the instructions of the court should be accurate. Lyons v. Ryerson, 242 Ill. 409, 416.

Said second instruction is as follows:

"The court instructs the jury that it was the duty of the defendant to exercise reasonable care to see that the premises, or place where the decedent Howe was sent in the performance of his duties was reasonably safe for that purpose, that if the defendant failed in the performance of this duty toward the decedent the said Matthew Howe, as charged in the declaration, while in the exercise of such care as an ordinarily prudent man would use under like circumstances, and did not assume the risk, if any, met with the accident and such accident caused his death, then you should find the defendant guilty."

This instruction does not require the jury to believe from the evidence the elements mentioned therein as essential to make out defendant's liability. It assumes that Howe "was sent" in the performance of his duties to the "premises or place" where, presumably under the evidence, he received his injuries. One of the defendant's contentions was that Howe was not sent, and should not have gone, to the place where plaintiff claimed Howe was injured. Whether he was so sent was an essential question of fact for the jury to determine from the evidence. Furthermore, the instruction in effect unqualifiedly announces it to be a

duty of defendant to keep reasonably safe the premises or place where Howe was injured, regardless of the question whether it was necessary or proper for Howe, in the performance of his duties, to go there. Stover Mfg. Co. v. Millane, 89 Ill. App. 532, 535.

The judgment of the Superior Court is reversed and the cause remanded.

*Reversed and remanded.*